509 A.2d 912

Kenneth D. Baldinger, Petitioner *v.* The Commonwealth of Pennsylvania et al., Respondents.

340

Heard September 24, 25, 26 and 27, 1985, before Judge PALLADINO.

*Thomas J. Schuchert,* with him, *Martin W. Sheerer* and *Shirley Novak,* for petitioner.

*James J. Kutz,* Senior Deputy Attorney General, with him, *Andrew S. Gordon,* and *Allen C. Warshaw,* Deputy Attorneys General, and *LeRoy S. Zimmerman,* Attorney General, for respondent, Commonwealth of Pennsylvania.

*Christine Dutton,* Assistant Counsel, for respondent, Department of Health.

*Harold Cramer,* Assistant Counsel, with him, *Michael J. McCaney,* Assistant Counsel, and *Spencer A. Manthorpe,* Chief Counsel, for respondent, Department of Transportation.

*John A. Mihalik, Hummel, James & Mihalik,* for respondent, Larry Smith, Chief of Police of Bloomsburg.

OPINION BY JUDGE PALLADINO, May 19, 1986:

### INTRODUCTION

This matter comes before the Court following four days of trial on the merits.[1] The issue presented is whether the Commonwealth of Pennsylvania shall be permanently enjoined from using the Smith and Wesson Breathalyzer 1000 for evidentiary purposes in any criminal or civil proceeding and from listing it as an approved evidential breath tester. This Petition for Review was filed in 1983; since that time, numerous changes have been made in the regulatory structure. Petitioner, Kenneth D. Baldinger, asserts in his complaint that the Breathalyzer 1000 is susceptible to electromagnetic interference, which causes the instrument "to produce results which lack reliability, are incorrect and have and will result in wrongfully subjecting [Petitioner] to criminal process, expense, possible conviction, fines, im-

---

[1] This Court has previously ruled upon Respondents' preliminary objections. Therein we held that: Petitioner did not have an adequate remedy at law under the Pennsylvania Rules of Criminal Procedure; Petitioner, as a licensed driver in Pennsylvania had standing to sue based on his implied consent to take a chemical blood alcohol test; Petitioner had stated a cause of action; and this Court had jurisdiction to hear the matter as it related to the failure of the Departments of Health and Transportation to perform their statutory duty. *Baldinger v. Commonwealth,* 85 Pa. Commonwealth Ct. 610, 483 A.2d 1027 (1984).

prisonment, loss of license and other penalties, as well as embarrassment and ridicule of the community." Petitioner also asserts that the regulations promulgated since the start of this litigation are insufficient to prevent erroneous results caused by electromagnetic interference.

The current law relating to the offense of driving under the influence of alcohol and chemical testing to determine the alcoholic content in one's blood states: 75 Pa. C. S. §1547

Chemical testing to determine amount of alcohol or controlled substance

(a) General rule.—Any person who drives, operates or is in actual physical control of the movement of a motor vehicle in this Commonwealth shall be deemed to have given consent to one or more chemical tests of breath, blood or urine for the purpose of determining the alcoholic content of blood or the presence of a controlled substance if a police officer has reasonable grounds to believe the person to have been driving, operating or in actual physical control of the movement of a motor vehicle:

(1) while under the influence of alcohol or a controlled substance or both; or

(2) which was involved in an accident in which the operator or passenger of any vehicle involved or a pedestrian required treatment at a medical facility or was killed.

. . .

(c) Test results admissible in evidence.—In any summary proceeding or criminal proceeding in which the defendant is charged with a violation of section 3731 or any other violation of this title arising out of the same action, the amount of alcohol or controlled substance in the defendant's

blood, as shown by chemical testing of the person's breath, blood or urine, which tests were conducted by qualified persons using approved equipment, shall be admissible in evidence.

(1) Chemical tests of breath shall be performed on devices approved by the Department of Health using procedures prescribed jointly by regulations of the Departments of Health and Transportation. Devices shall have been calibrated and tested for accuracy within a period of time and in a manner specified by regulations of the Departments of Health and Transportation. For purposes of breath testing, a qualified person means a person who has fulfilled the training requirement in the use of the equipment in a training program approved by the Departments of Health and Transportation. A certificate or log showing that a device was calibrated and tested for accuracy and that the device was accurate shall be presumptive evidence of those facts in every proceeding in which a violation of this title is charged.

(2) Chemical tests of blood or urine shall be performed by a clinical laboratory licensed and approved by the Department of Health for this purpose using procedures and equipment prescribed by the Department of Health. For purposes of blood and urine testing, qualified person means an individual who is authorized to perform those chemical tests under the act of September 26, 1951 (P.L. 1539, No. 389), known as 'The Clinical Laboratory Act.'

(d) Presumptions from amount of alcohol.—if chemical testing of a person's breath, blood or urine shows:

(1) That the amount of alcohol by weight in the blood of the person tested is 0.05% or less, it

shall be presumed that the person tested was not under influence of alcohol and the person shall not be charged with any violation under section 3731(a)(1) or (4) (relating to driving under influence of alcohol or controlled substance), or if the person was so charged prior to the test, the charge shall be void ab initio. This fact shall not give rise to any presumption concerning a violation of section 3731(a)(2) or (3).

(2) That the amount of alcohol by weight in the blood of the person tested is in excess of 0.05% but less than 0.10%, this fact shall not give rise to any presumption that the person tested was or was not under the influence of alcohol, but this fact may be considered with other competent evidence in determining whether the person was or was not under the influence of alcohol.

(3) That the amount of alcohol by weight in the blood of the person tested is 0.10% or more, this fact may be introduced into evidence if the person is charged with violating section 3731.

75 Pa. C. S. §3731

Driving under influence of alcohol or controlled substance

(a) Offense defined.—A person shall not drive, operate or be in actual physical control of the movement of any vehicle while:

(1) under the influence of alcohol to a degree which renders the person incapable of safe driving;

(2) under the influence of any controlled substance, as defined in the act of April 14, 1972 (P.L. 233, No. 64), known as 'The Controlled Substance, Drug, Device and Cosmetic Act,' to a degree which renders the person incapable of safe driving;

(3)   under the combined influence of alcohol and any controlled substance to a degree which renders the person incapable of safe driving; or

(4)   the amount of alcohol by weight in the blood of the person is 0.10% or greater.

Petitioner argues that because Section 3731(a)(4) makes driving with a 0.10% blood alcohol content (BAC) an offense, the instruments used to determine BAC must produce reliable results. If the Breathalyzer 1000 does not produce reliable results, then its use as an evidential breath tester presents a strong likelihood of irreparable harm, in the form of an erroneous conviction under Section 3731(a)(4).

To obtain injunctive relief, a party must establish a clear right to relief, and show that irreparable harm will occur if such relief is not granted. *Moyer v. Davis*, 67 Pa. Commonwealth Ct. 251, 446 A.2d 1355 (1982) *aff'd*, 501 Pa. 192, 460 A.2d 754 (1983).

With this in mind, upon consideration of the testimony and other evidence presented,[2] this chancellor makes the following:

### FINDINGS OF FACT

1.   Petitioner, Kenneth D. Baldinger, is a resident of Allegheny County, and is a licensed driver in the state of Pennsylvania.

2.   On May 7, 1983, Petitioner was charged by the McCandless Township Police with driving under the influence of alcohol, and he was asked to take a breathalyzer test.

---

[2] At the hearing, Respondents moved to preclude the introduction of Petitioner's trial deposition of Ronald L. Romesburg, based on Mr. Romesburg's refusal to answer Respondent's questions on cross-examination. Because of the importance of the fifth amendment right asserted by Mr. Romesburg as the basis for his refusal to answer, this Court must deny Respondent's motion to preclude.

3. At Petitioner's trial on these charges, the results of Petitioner's breathalyzer test were not used.

4. Petitioner was acquitted of the charges.

5. No charges of driving under the influence are currently pending against Petitioner.

6. The Department of Health (DOH) is vested by statute, 75 Pa. C. S. §1547(c)(1), with the responsibility for selecting the Evidential Breath Testers (EBTs) used in the Commonwealth.

7. Before DOH was assigned this responsibility, the Department of Transportation (DOT) approved EBTs for use in Pennsylvania.

8. The Smith and Wesson Breathalyzer 1000 had been approved for use by DOT before DOH assumed responsibility.

9. DOH relied upon the National Highway Transportation Safety Administration (NHTSA) list of qualified products in reviewing EBTs used in Pennsylvania.

10. The DOH relies on NHTSA's qualified products list for several reasons; including the following:

(a) the federal laboratory which performs the testing on the EBTs is the Transportation Systems Center (TSC) of NHTSA, a laboratory of national reputation which employs individuals whose credentials are reliable; and

(b) given the comprehensiveness of the testing and the design evaluation performed by TSC, it would serve no purpose for DOH to duplicate all of the testing and evaluating which has already been performed by TSC.

11. In 1975, NHTSA, through the TSC, performed a series of tests on eight EBTs for possible inclusion on NHTSA's qualified products list, including a Smith & Wesson Breathalyzer 1000. Exhibit D-7.

12. The testing performed by TSC was comprehensive and included the following: a precision test using a

known ethanol vapor concentration; an accuracy test using a known ethanol vapor concentration; a blank test using alcohol-free test subjects; a power line voltage test; an ambient temperature test; a vibration test; and an electrical safety inspection test. In addition, TSC undertook a general examination of each instrument to ensure that the EBT's principle of operation, logic, and circuitry was sound. *See* Exhibit D-7, N.T. 434-437.

13. The Smith & Wesson Breathalyzer 1000 successfully passed each of the tests to which it was subjected, and based upon its successful passing of each test and TSC's satisfaction that the design and mode of operation were sound, TSC recommended to NHTSA that the device be placed on NHTSA's qualified products list. N.T. 447-448; Exhibit D-7 at Table IV.

14. From the time NHTSA first approved the Breathalyzer 1000 in 1975, Smith & Wesson has implemented some minor modifications to the instrument; the size of the light aperture was reduced, a timing increment was placed on the device's lamp, and a resistor was added to modify any impedance of the photo cell. However, none of these modifications constitutes a change in the design of the unit, although Smith & Wesson, for internal identification purposes, does refer to the two units as 1000A and 1000B. N.T. 334, 496.

15. NHTSA's qualified products list is published to insure that federal funds allocated to the states for purchase of EBTs are used efficiently and are spent on reliable instruments.

16. The Smith and Wesson Breathalyzer 1000 (1000) was approved for use in Pennsylvania by DOH because: 1) the 1000 was listed on NHTSA's qualified products list; and 2) the 1000 was available from the manufacturer.

17. The Smith and Wesson Breathalyzer 1000 is an acid dichromate based colorimeter. A fixed volume of

the human subject's breath is collected at constant temperature and delivered into an ampoule containing the dichromate solution. Any alcohol present reacts with the dichromate quantitatively, reducing the intensity of the yellow color of the solution. The reduction of color intensity is a linear function of the amount of alcohol delivered into the ampoule. Petitioner's Exhibit 13.

18. The design of the 1000 is based on a theory which provides that the ratio of blood alcohol content to breath is 2100 to 1.

19. The design of the 1000 is such that it will produce a reading which is 10% to 20% lower than the actual blood alcohol content.

20. The design of the 1000 has three major sub-assemblies: 1) breath collection sub-assembly; 2) alcohol measurement sub-assembly; and 3) read-out sub-assembly. Petitioner's Exhibit 13.

21. The breath collection sub-assembly retains the last 52 cubic centimeters of breath delivered by the subject, at a constant temperature. This breath sample is introduced into the dichromate solution ampoule. When the alcohol-dichromate reaction is completed, a light bulb located between the test ampoule and a second reference ampoule is switched on. A light filter photo detector is located behind each ampoule. Light passing through each ampoule and filter falls on the photodetectors. Loss of dichromate by reaction with alcohol results in a decrease in intensity of the yellow color of the test ampoule, which causes an unequal amount of light to pass through the ampoules. This inequality is measured by the photodetectors, and then converted into a read-out which is the subject's blood alcohol concentration. Petitioner's Exhibit 13.

22. The three major functions of the 1000 are automated, and are controlled by a printed circuit board, and activated by a servo-driver printed circuit board. Petitioner's Exhibit 13.

23. Electromagnetic interference (EMI) occurs when an undesired signal of a given frequency intrudes upon the operation of an instrument. The instrument may be susceptible to EMI if the frequency corresponds to the electronics or wiring in the instrument. The instrument's susceptibility to EMI is affected by the strength of the interfering frequency. There are hundreds of frequencies in a given environment, but of varying strengths. Many electronic instruments are often compatible with such environments.

24. EMI may be generated from a number of sources, *e.g.* A.M. transmitters, F.M. transmitters, mobile telephones, citizens band radios, ham radios. Other sources of interference include rotating machinery, which generates broad band interference (Taggart deposition).

25. Any piece of electronic equipment will be susceptible to some type of electrical signal. Some are more sensitive than others.

26. Instruments can be shielded, or "hardened" to interference, with metal.

27. In May of 1982, Dr. Shoemaker of DOH first became aware that EBTs might have problems when exposed to EMI.

28. NHTSA, following complaints from police departments in Maryland, requested the National Bureau of Standards (NBS) to investigate the possible interference with the operation of EBTs from EMI.

29. NBS began its studies in June of 1982, under the direction of Harold Taggart, an expert in EMI.

30. NBS tested a total of twenty-two (22) different models of EBTs, six of which did not work. The results of NBS's study were based on the remaining sixteen instruments.

31. One Smith and Wesson 1000 was tested as part of the NBS investigation.

32. The 1000 was exposed to four different frequencies; 46 megahertz, 160 megahertz, 460 megahertz, and 850 megahertz at a field strength of 10 volts/meter.

33. At three of the four frequency levels tested, the 1000 either ceased operation or set an error flag in the presence of EMI.

34. At 850 megahertz, the 1000 showed a + 12.2% change when compared to readings taken without the presence of EMI.

35. The NBS study only tested one 1000, but because each instrument is slightly different in response to EMI, the results of the NBS study are not indicative of the 1000's response to EMI in general.

36. The NBS report specifically warns that the scope of the study was very limited and that the results "cannot be extrapolated with validity to cover other frequencies, to other field strengths, to multiple frequency fields, or to other units of the same EBT instruments."

37. In 1982, Smith and Wesson issued customer advisories concerning the possible effects on their breathalyzer equipment from EMI.

38. Smith and Wesson advised that the 1000 be "retrofitted" with the installation of a cast aluminum box over the servo-driver circuit board, which is the portion of the instrument most susceptible to EMI.

39. The retrofit was installed by Smith and Wesson on 1000s returned to it for that purpose, and by Guth Laboratories of Harrisburg, Pennsylvania.

40. In addition to installing the cast aluminum box, the retrofitting process also included the addition of capacitors to lead into the box from the outside electronics, and the removal of the heat sink.

41. The heat sink had been placed around the circuitry, and its function was to dissipate heat generated by that circuitry.

42. Without the heat sink, the retrofit must act as a radiator, to dissipate the heat generated by the components within it.

43. Richard Guth, of Guth Laboratories, testified that the retrofitted 1000 did not work well. He opined that the removal of the heat sink creates the possibility of overheating in the 1000, which would make the operation of the components less effective.

44. The testimony from Matthew Maskas showed that Smith & Wesson did perform testing to determine whether or not the final amplifier overheated because of the absence of a heat sink, and the results of that testing revealed that the final amplifier did not overheat. N.T. 249.

45. The addition of the retrofit was not reported to NHTSA, therefore NHTSA did not retest the retrofitted 1000 for the qualified products list.

46. Guth Laboratories removed the retrofit on approximately sixty (60) 1000s.

47. Guth Laboratories has developed the Sentro-3, an EMI detector, to use with the 1000, which is a separate unit that plugs into the 1000. The Sentro-3 shuts off the 1000 if any EMI is detected.

48. The unmodified Breathalyzer (*i.e.* the non-retrofitted device) is a poor receiver of radio frequency and the retrofitted instrument is an even poorer receiver of radio frequency. N.T. 66.

49. The field strengths which are necessary to affect the Breathalyzer (even without the retrofit) normally do not exist in a police environment; in fact, it is not reasonably possible for the Breathalyzer 1000 to be at a point of reception in a police station where sufficiently strong radio frequency would be present so as to affect the device's operation. N.T. 618, 624-628.

50. Experts for both sides agreed that radio frequency field strength of several volts per meter are necessary to

affect even the non-retrofitted Breathalyzer. Petitioner's witness, Richard Guth, testified that field strengths of less that 3 volts per meter would not affect a non-retrofitted Breathalyzer, and further testified that a field intensity of 10 to 15 volts per meter would be required to affect the retrofitted instrument. N.T. 393. Mr. Neubauer, Respondents' witness, generally concurs. N.T. 605, 613, 616.

51. The 1000 is susceptible to EMI, without the retrofit.

52. The amount of voltage necessary to disrupt the 1000 depends on the frequency and the distance of the 1000 from the source of EMI.

53. Each instrument reacts differently because each instrument's circuitry is slightly different, an individual personality.

54. Hand-held radios or police car radios in a police station parking lot should not be used when running a breath test.

55. Smith and Wesson issued an EMI test protocol which requires the instrument to be turned 90° four times and tested at each position for EMI.

56. The Smith and Wesson EMI test protocol must be used every time the 1000 is used and only works as a check for fixed constant sources of EMI.

57. Because of the limited nature of the Smith and Wesson EMI test protocol, it is not 100% insurance that no EMI is present during the breath test.

58. EMI will only affect the operation of a 1000 during its analytical phase, its blank stage or its purge stage.

59. The purge stage clears the chamber of the breath sample.

60. If EMI occurs during the purge stage, and if the 1000 is affected, the machine would register a reading of "00", which would indicate to the operator that something was wrong.

61. The analytical phase is three to five seconds in duration.

62. Guth Laboratories is one of the manufacturers of ampoules to be used with EBTs.

63. Mr. Guth testified that the chemical composition and quality of the ampoules are very important to the results of EBT tests.

64. The regulations in place now govern quality, but not quantity of ampoule ingredients.

65. Guth Laboratories also manufactures simulator solution to be used with EBTs.

66. The simulator is a temperature device used to heat simulator solution to 34°C, the temperature of a person's breath.

67. The simulator solution simulates the breath of an individual with a known alcohol content, *e.g.* 0.10% alcohol by weight.

68. The simulator solution is used to test the 1000 for accuracy, and to calibrate the instrument.

69. The composition of the simulator solution must be pure, and the temperature must be 34°C for the calibration to be precise.

70. The simulator itself is not required under the present regulations to be tested periodically to insure it is heating the solution to 34°C.

71. Guth Laboratories sends its ampoules and simulator solution for certification to independent labs in Knoxville, Tennessee or New York.

72. Guth Laboratories services 1000s, but has not been servicing many recently because: 1) the 1000 is not in use currently; and 2) Smith and Wesson ceased producing the 1000 in 1982.

73. Guth discovered that 1000s delivered to his lab from the Smith and Wesson factory had problems, due to poor quality control.

74. Guth took apart and reassembled all 1000s from the factory to insure they worked properly.

75. Guth Labs would not release a 1000 back into service unless it was working properly.

76. Dr. Arthur L. Flores, of NHTSA's Transportation Systems Center, was qualified as an expert in chemistry, and specifically the chemistry and operation of EBTs.

77. Because of problems reported to NHTSA from Maryland in 1980, NHTSA requested another investigation into the 1000.

78. As a result of this investigation, Dr. Flores concluded that the manufacturer was not meeting its obligation to insure the equipment delivered to customers was working properly.

79. Additionally, because the 1000 required more maintenance to perform on the same level as other EBTs on the qualified products list, the other EBTs were more cost-effective.

80. For these reasons, Dr. Flores recommended that the 1000 be removed from NHTSA's qualified products list.

81. Dr. Flores did not find that the 1000 was not capable of operating properly or yielding precise and accurate results.

82. When the 1000 is maintained properly and operated by an individual who uses procedures to insure against malfunctions, the 1000 works as well as any other EBT.

83. NHTSA has not removed the 1000 from its qualified products list.

84. The current regulations require a breath test subject to take two consecutive tests, followed by a third simulator test with simulator solution of 0.10%.

85. Presently Pennsylvania regulations require, *inter alia,* the following:

   (a) an annual calibration test which confirms the instrument's accuracy and precision at three

different BAC levels and requires that the instrument be taken out of service if the average deviation of any set of results exceeds .005% or if any single test result exceeds .01% of the known standard, (section 77.26);

(b) a 30 day accuracy test which confirms the instrument's accuracy and precision at .100% BAC, and requires that the instrument be taken out of service if the average deviation of five test results exceeds .005% or if any single test result exceeds .109% or falls below .090%; and

(c) two consecutive breath tests on all suspects as well as a follow-up simulator test;

(i) If the two suspect test results exceed a tolerance of 19/1000 of a percent, the test results are inadmissible and the instrument must be removed from service.

(ii) If the two suspect test results do not exceed the tolerance of 19/1000%, the *lower* of the two results may be admitted into evidence if a follow-up simulator test, designed to give a reading of .100%, yields a result that is not less than .090% or greater than .109%. Section 77.24(b)(2) (ii).

(iii) If the simulator test yields a result that either falls below .090% or exceeds .109%, the suspect's test result is again inadmissible and the instrument must be taken out of service, even though the 2 subject tests were within tolerance.

67 Pa. Code §77.24-77.26, effective February 23, 1985; *see* 15 Pa. Bull. 681.

86. Prior to any instrument being placed back into service, it must be serviced, repaired or adjusted, and again tested and calibrated for accuracy. *See* 77.24(c).

87. Double testing is important for determining if the test results are valid, because if a result is valid, it should be reproducible.

88. The two test results should be within a reasonable tolerance of each other, to insure the validity of the result.

89. Pennsylvania's regulations require the results of the two tests to be within 0.019 of each other.

90. NHTSA has no regulations or guidelines for double testing or the acceptable tolerance to be used.

91. Dr. Flores had no reason to believe that if the 1000 is properly maintained and tested, and operated in accordance with Pennsylvania's regulations, that an innocent person would be convicted of a drunk driving charge by reason of an erroneous breath test result from the 1000.

92. The interlocking safeguard provided by Pennsylvania's regulations would allow an operator of the 1000 to detect an erroneous result.

93. Dr. Flores tested one retrofitted 1000 for precision and susceptibility to EMI.

94. This 1000, serial # 3131, passed both the precision and accuracy test and the tests under EMI.

95. The same instrument, # 3131, had been previously sent to NBS for EMI tests; however, NBS could not get the instrument to work properly, so no EMI tests were run.

96. The modifications to the originally designed Breathalyzer 1000, including the retrofit, are not significant, do not constitute a design change, and do not affect the overall operation or accuracy of the device; accordingly there is no reason to conclude that the retrofitted Breathalyzer 1000 is any less reliable. N.T. 249-250, 453, 322-323, 334, 453, 496, 607.

97. The Commonwealth's training and certification program for EBT operators, maintenance technicians, and classroom instructors is comprehensive, and ensures that those who operate or repair these devices are adequately trained and competent. Before one can op-

erate a device, perform maintenance on. it, or teach a course of instruction, he or she must be certified under criteria and curricula which are stringent and thorough. N.T. 526-686.

98.   In order to become a certified breath test operator, a law enforcement officer must undergo forty (40) hours of instruction.

99.   The course curricula include a section on detecting EMI and prevention of EMI.

100.   The instruction includes a description of how an EBT reacts when EMI affects it, so that the operator would be able to reject the test results.

101.   The factors which indicate that the 1000 is being affected are:

> First, the rotational speed of the instrument's servo motor acts in an erratic fashion, and the operator can hear the motor speed up, slow down and even stop. N.T. 617.
>
> Second, the numitron display, which produces the numerical readout, produces exaggerated, erratic readouts, and sometimes completely locks out or blanks. In addition, when EMI was present, the instrument's printer printed an "X" which indicates false information. N.T. 617.

102.   The "window of susceptibility" during which time the 1000 is susceptible to EMI is very narrow; the susceptibility occurs only for a short period of time during the purge cycle, blank cycle and the subject's test cycle. N.T. 629.

103.   In order for the Breathalyzer 1000 to yield an erroneous breath-test result by reason of radio frequency interference, five factors would have to be present;

> (a)   a radio signal would have to be present during the window of susceptibility,
>
> (b)   the signal would have to be of sufficient intensity or strength to come above the threshold of response of the instrument;

(c) the signal would have to be of the correct frequency to which the unit responds;

(d) the interference would have to appear at a proper timing sequence since the effect that the energy has on the Breathalyzer's system is an interruption or interference with the timing pulse counter; and

(e) the interference would have to be of sufficient duration so that it comes into step with the measuring cycle.

N.T. 631-632.

104. Because Pennsylvania's regulatory law requires two subject tests and a follow-up simulator test, which results must be within a reasonable tolerance, the probability of each of the five above-referenced factors being present during each of the three test protocol prongs, and the operator not detecting any malfunction or other erroneous conduct by the Breathalyzer, is highly unlikely.

105. Under Pennsylvania's present regulatory scheme, the probability of a suspect being convicted as a result of an erroneous breath test result, whether the error is by reason of radio frequency or general malfunction, is highly improbable; either (a) the instrument will yield accurate results, (b) the operator will be able to detect improper functioning of the instrument, or (c) the instrument will test itself out of service because it cannot meet either the (1) annual calibration test, (2) the 30 day accuracy test, (3) the double subject tolerance allowance, and/or (4) the follow-up simulator tolerance allowance. N.T. 410, 412-414, 463, 478, 632-633.

106. Petitioner produced no evidence that a single individual was convicted of driving under the influence as a result of an erroneous reading received on a Breathalyzer 1000 under Pennsylvania's present regulatory scheme.

107. Petitioner produced no witness who testified that the basic design or logic of the Breathalyzer 1000 was faulty or otherwise incapable of providing accurate readings; in fact, virtually all evidence points to the reliability of the instrument.

108. The great weight of evidence leads to the conclusion that the Breathalyzer 1000 is an effective and accurate evidential breath-testing instrument if operated in accordance with Pennsylvania's present regulatory criteria.

109. The great majority of Petitioner's case involved matters which occurred or existed several years ago, and/or involved sporadic, isolated instances of the Breathalyzer's alleged malfunction or inaccuracy.

110. The current regulations are adequate to protect against erroneous results.

111. The education program for EBT operators in Pennsylvania is comprehensive and satisfactory.

112. The Smith and Wesson Breathalyzer 1000, with or without the retrofit, if properly maintained and operated in accordance with the current regulations, presents no threat of erroneous conviction under the Vehicle Code.

113. An individual who is prosecuted for driving under the influence of alcohol on the basis of a Breathalyzer 1000 reading can present evidence at trial to establish any circumstances which may have affected the reading so as to create a false higher reading.

114. The science of the Breathalyzer 1000 presents far less chance of erroneous conviction than prior instruments, or than evidence acquired solely from field tests given by police officers.

## Conclusions of Law

1. The only relief available to Petitioner is the granting of prospective, equitable relief; this Court has no

authority to award damages, grant retroactive relief, or declare void the convictions or arrests of any persons who have already been convicted or arrested for driving under the influence.

2. DOH's reliance on NHTSA's qualified products list to determine which EBTs should be used in Pennsylvania is reasonable.

3. The Department of Health is charged by law to approve those evidential breath-testing devices which may be used by law enforcement personnel in Pennsylvania. 75 Pa. C. S. §1547(c)(1).

4. The Department's approval procedures for approving devices are reasonable and lawful.

5. The Smith & Wesson Breathalyzer 1000 is an EBT which is adequate in design and capable of producing accurate, reliable results when operated and maintained in accordance with Pennsylvania's present regulatory scheme.

6. Petitioner did not meet his burden of proving that the Breathalyzer 1000 is an unreliable device when operated in accordance with present Pennsylvania regulations.

7. The jointly promulgated regulations of the Departments of Health and Transportation presently in force are reasonable, comport with state law, and ensure valid test results. *See* 75 Pa. C. S. §1547(c).

8. Petitioner has not met his burden of proving that he will suffer irreparable harm which would support the issuance of an injunction removing the Smith and Wesson Breathalyzer 1000 from Pennsylvania's list of approved evidential breath testers.

9. Accordingly, judgment must be entered in favor of Respondents.

## DECREE NISI

AND NOW, May 19, 1986, Respondents' Motion to Preclude trial deposition of Ronald L. Romesburg is

hereby denied. The Petition for Review filed by Petitioner, Kenneth D. Baldinger, requesting permanent injunctive relief is denied. Costs to be paid by Petitioner.

Unless motions for post-trial relief pursuant to Pa. R.C.P. No. 227.1 are filed within 10 days of the date hereof, this decree nisi shall be entered as a final decree by the Chief Clerk upon praecipe of either party.

June 5, 1986, the Order of the Court dated May 19, 1986, is hereby entered as a final Decree and Judgment.