Flora SWEENEY

v.

COMMONWEALTH of Pennsylvania, DEPARTMENT OF TRANSPORTATION, BUREAU OF DRIVER LICENSING, Appellant.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 1, 2000.

Decided July 3, 2002.

Reargument En Banc Denied Aug. 26, 2002.

Elaine N. Blass and Timothy P. Wile, Asst. Counsel In-Charge, Harrisburg, for appellant.

Paul D. Boas, Pittsburgh, for appellee.

Before DOYLE, Senior Judge,[1] McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Senior Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge DOYLE.

The Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing (DOT) appeals from an order of the Court of Common Pleas of Allegheny County, which sustained the statutory appeal of Flora Sweeney challenging DOT's imposition of a one-year suspension of her driving privilege pursuant to section 1547(b)(1) of the Vehicle Code (Code).[2] We reverse.

---

1. This case was assigned prior to the date when President Judge Doyle and Judge Kelley assumed the status of senior judge on January 1, 2002, and when Judge Flaherty assumed the status of senior judge on December 24, 2000.

2. Section 1547(b)(1) of the Code, 75 Pa.C.S. § 1547(b)(1) provides:

DOT suspended Sweeney's driving privilege as the result of a reported refusal to submit to chemical testing. Sweeney filed an appeal with Common Pleas, which held a *de novo* hearing.

At the hearing, DOT presented the testimony of Officers Matthew Cornwall and Howard McQuillan. Officer Cornwall testified that: (1) he stopped Sweeney's vehicle on April 10, 1998, because the vehicle went through a red light; (2) he detected an odor of alcohol coming from the interior of the vehicle; (3) Sweeney explained that she had just dropped off friends who had been drinking; (4) he performed field sobriety tests; (4) Sweeney staggered while trying to walk heel-to-toe in a straight line; and (5) he transported Sweeney to the police station so that Officer McQuillan, a qualified test administrator, could administer a breath test. (Reproduced Record (R.R.) at 10a–15a, 17a–18a.)

Officer McQuillan testified that: (1) Sweeney readily agreed to submit to chemical testing before he even read her the warnings; (2) he instructed Sweeney to take a deep breath and blow into the mouthpiece of the Intoxilyzer 5000 until he told her to stop; (3) Sweeney placed the mouthpiece in her mouth and formed a tight seal around it with her lips; (4) Sweeney attempted many times to blow into the mouthpiece, but her breaths were not hard enough or long enough; (5) Sweeney appeared to be trying to provide a sufficient breath sample; and (6) Sweeney did not inform him that she suffered from a breathing disorder. (R.R. at 26a–28a, 31a–32a.)

(b) Suspension for refusal.—
(1) If any person placed under arrest for a violation of section 3731 (relating to driving under the influence of alcohol or controlled substance) is requested to submit to chemical testing and refuses to do so,

Sweeney presented the testimony of Charles L. Winek, a professor of toxicology at Duquesne University and, previously, the chief toxicologist of Allegheny County for thirty-two years. (R.R. at 35a.) Winek testified that he "started the breath testing program in Allegheny County in 1966" and "taught it continuously until 1998." (R.R. at 35a.) Winek further testified:

Q. Can you tell us whether the check that the machine runs through, when they start it up and the calibration of the machine, has any relationship to the function of the machine that deals with registering insufficient samples?

A. To my knowledge, it does not. The aspect of [a] deficient sample is a feedback mechanism when the cylinder is filled; and in order to fill the cylinder, you have to have enough pressure to overcome the resistance offered by that cylinder in the instrument.

And the resistance offered by that cylinder varies. It is **generally** set at the factory at six pounds per square inch. Some people cannot blow in at that level.

Q. Even completely sober and healthy?

A. That is true. It depends [on the individual]. . . .

**So, we . . . lowered [the machines] to about three pounds per square inch. . . .**

Q. And would . . . a properly calibrated machine have anything to do with whether or not the function, about blowing hard enough, is working correctly?

the testing shall not be conducted but upon notice by the police officer, the department shall suspend the operating privilege of the person for a period of 12 months.

A. It doesn't tell you that, no.

Q. And when they run it through the initial test ampoules, does that have anything to do with insufficient samples working properly?

A. Not to my knowledge.

Q. And if it wasn't working properly, that could affect whether a person, who was driving, registered a sample or is capable of blowing long enough; is that correct?

A. Yes.

(R.R. at 36a–38a.) Sweeney testified on her own behalf that she tried the best she could to follow the officer's instructions and to provide a breath sample. (R.R. at 46a.)

After considering the evidence presented, Common Pleas accepted Sweeney's testimony and sustained Sweeney's appeal. Common Pleas explained that Sweeney "made the best effort possible at the time to provide the samples but was unable to do so for reasons beyond her control." (Common Pleas Court op. at 1.)

■ On appeal to this Court,[3] DOT argues that Common Pleas erred in sustaining Sweeney's appeal, relying on numerous decisions of this Court. We agree.

■ Our statute makes it clear that refusal to take a chemical test of blood, breath or urine is a required finding in a driver's license suspension, Section 1547(b)(1) of the Vehicle Code, 75 Pa.C.S. § 1547(b)(1), and the law is now well established that failure to complete a breathalyzer test, **whether or not a good faith effort was made to do so, constitutes a refusal per se to take the test.** *Department of Transportation, Bureau of Driver Licensing v. Kilrain,* 140 Pa.Cmwlth. 484, 593 A.2d 932 (1991), *petition for allowance of appeal denied,* 529 Pa. 625, 600 A.2d 541 (1991).[4] Our Supreme Court has also considered this issue and confirmed that "failure to supply a sufficient breath sample for any of the [breathalyzer] tests [is] a deemed refusal to submit to testing." *Department of Transportation, Bureau of Driver Licensing v. Boucher,* 547 Pa. 440, 448, 691 A.2d 450, 454 (1997). We have consistently held that failure to provide a deep lung breath sample required for testing by the Intoxilyzer machine constitutes a test refusal, unless the licensee can show that the failure to produce a sample was due to a physical inability caused by a medical condition unrelated to ingestion of alcohol or drugs. *See Pappas v. Department of Transportation, Bureau of Driver Licensing,* 669 A.2d 504, 508 (Pa.Cmwlth. 1996) (stating that, where a licensee fails to "exert a total conscious effort, and thereby fails to supply a sufficient breath sample, such is tantamount to a refusal to take the test")(quoting *Appeal of Budd,* 65 Pa.Cmwlth. 314, 442 A.2d 404 (1982));

**3.** In an appeal arising from a suspension of a driver's license, our review is limited to determining whether the trial court's decision is supported by competent evidence, whether there has been an error of law, or whether the decision of the trial court indicates a manifest abuse of discretion. *Department of Transportation, Bureau of Driver Licensing v. Kilrain,* 140 Pa.Cmwlth. 484, 593 A.2d 932 (1991), *petition for allowance of appeal denied,* 529 Pa. 625, 600 A.2d 541 (1991).

**4.** In *Kilrain,* we reversed the trial court's determination that the licensee had made a good faith effort to complete the test and clearly stated:

> The bedrock principal [sic] [...] is that **failure to complete a breathalyzer test constitutes a refusal. A trial court's finding that a licensee made a good faith attempt to complete the breathalyzer test is irrelevant to the question of whether the licensee refused the test. Anything less than a completed breathalyzer test which registers a blood alcohol reading on the breathalyzer constitutes a refusal.**

*Kilrain,* 593 A.2d at 935 (emphasis added).

*Mueller v. Department of Transportation, Bureau of Driver Licensing,* 657 A.2d 90 (Pa.Cmwlth.), *petition for allowance of appeal denied,* 542 Pa. 637, 665 A.2d 471 (1995) (noting that we have attempted to steadfastly recognize that a licensee's failure to provide a breath sample sufficient to complete a breathalyzer test constitutes a refusal); and *Department of Transportation, Bureau of Driver Licensing v. Beatty,* 143 Pa.Cmwlth. 272, 598 A.2d 1069 (1991) (indicating that a licensee's failure to supply a sufficient breath sample is a per se refusal); *Department of Transportation v. Gross,* 146 Pa.Cmwlth. 1, 605 A.2d 433 (1991) (same).

There is no allegation in this case that the testing equipment and the operator were improperly certified or that the testing procedures were not in accordance with requirements set forth by the Pennsylvania Department of Transportation. (Reproduced Record (R.R.), pp. 22a 24a.) Officer McQuillan testified that the machine was operating properly and that Sweeney attempted to blow into the machine many times, but that she wouldn't blow hard enough or long enough to properly complete the test. Officer McQuillan testified:

Q. Approximately how many times did she attempt to blow into the machine?

A. I couldn't count. It was a lot. And I kept telling her to blow into it properly. To blow longer, blow harder.

\* \* \* \*

Q. Was she stopping before you told her to stop?

A. Yes.

(R.R., pp. 28a–30a.) And on redirect examination, Office McQuillan testified:

Q. Officer, isn't it true that during multiple attempts that she made, she did not blow into the machine in the manner in which you had instructed her?

A. That's correct.

(R.R., p. 34a.)

Sweeney's expert indicated that *generally* Intoxilyzers needed to be set to a lower expiratory volumetric force of 3 pounds per liter. But Sweeney presented absolutely no evidence that *this* Intoxilyzer required an expiratory volumetric force of 6 pounds per liter rather than the 3 pounds per liter that her expert said was a better setting.

Succinctly, the testimony of Sweeney's expert toxicologist consists entirely of conjecture and mere possibilities. A more complete examination of this expert's testimony reveals the following:

Q. You have to blow with a certain amount of pressure ... for a certain period of time; and the period of time depends on the—what amount of pressure you are blowing with.

A. That is part of it; and the instrument constantly is monitoring the breath that is going into it; so if you have a mouth full of alcohol in there, it will register a higher number, if you watch the display, you can see this, if the display is on, you have a visual and audio communication with this instrument.

Q. Okay.

A. If somebody is blowing into the instrument, **they don't have to blow like they are blowing up a balloon, real hard.** They should be able to blow into the instrument and fill the chamber. All right.

Now, depending on their own [vital capacity], if they are capable of doing that.

Q. Okay.

A. So, **there are people with certain chronic obstructive pulmonary**

diseases such as asthma, things of that nature, they cannot take a breath test and really should be given a blood test.

\* \* \* \*

Q. [I]sn't it true that such—if she didn't blow long enough or hard enough

\* \* \* \*

A. **If she didn't blow long enough or hard enough, she could not deliver a sample to fill the cylinder, correct.**

Q. And you are saying, though, that someone may not be able to blow with the—with a sufficient amount of pressure for the period of time that is required *if* **they suffer from a certain type of respiratory disorder.**

A. **That's correct.**

Q. Now, in this case, Doctor, ... have you examined Ms. Sweeney with regard to any respiratory disorder?

A. **I have not. I do not know about her respiratory system.**

(R.R., pp. 40a–42a.) (Emphasis added.)

Our Supreme Court in *Todd v. Department of Transportation, Bureau of Driver Licensing,* 555 Pa. 193, 723 A.2d 655 (1999), held that three failed attempts to produce a completed test was a refusal to submit to chemical testing, even if those three attempts were completed prior to the end of the machine cycle. In *Todd,* as in the instant matter, the licensee claimed that after the consequences of an incomplete test were emphasized, he "exhaled with as much force as he was able to generate on the second and third attempts," but he still failed to complete a single test. *Id.* at 657. Todd was found to have refused the test. The Supreme Court also remarked that it had previously held that "failure to supply adequate

breath samples during multiple attempts to administer a test was a deemed refusal to submit to testing." *Id.* at 658 (citing *Boucher* ).

We must dispel whatever misconception still remains that good faith attempts to complete a breath test are sufficient to avoid the consequences of Section 1547 of the Code, 75 Pa.C.S. § 1547(b)(1). Acceptance of conjecture and mere possibilities with regard to the operation of the Intoxilyzer 5000, without an offer of proof that the specific Intoxilyzer used in the case before the court functioned inadequately, would unravel years of established precedent and effectively destroy the viability of the Intoxilyzer 5000 as an effective tool in the unending battle against the drunken drivers on our roads. We note that the United States Supreme Court has recognized the effectiveness and reliability of the Intoxilyzer. *See, e.g., California v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984) (commenting on the accuracy of the Intoxilyzer as having passed accuracy requirements established by the National Highway Traffic Safety Administration of the U.S. Department of Transportation, as well as state certifications).

We conclude that the Commonwealth has clearly met the requirements of the statute in this matter, and the order of the Allegheny County Court of Common Pleas is reversed.

Judge SMITH–RIBNER dissents.

Senior Judge KELLEY dissents.

### *ORDER*

**NOW,** *July 3, 2002,* the order of the Court of Common Pleas of Allegheny County in the above-captioned matter is hereby reversed.

DISSENTING OPINION BY Judge FRIEDMAN.

I respectfully dissent. Here, the licensee presented: (1) credible expert testimo-

ny that an Intoxilyzer 5000 with a resistance setting above three pounds per square inch may prevent a sober and healthy person from providing sufficient breath samples; (2) evidence accepted by the trial court that the licensee was sober and healthy at the time of the Intoxilyzer 5000 breath test; and (3) credible testimony that the licensee made her best effort to provide sufficient breath samples. Unlike the majority, I would hold that, when a licensee presents such evidence, the burden of proof shifts to the Commonwealth of Pennsylvania, Department of Transportation, Bureau of Driver Licensing (DOT) to show that the breathalyzer's resistance setting did not deprive the licensee of a reasonable and sufficient opportunity to complete the chemical testing.[1] The majority's contrary holding establishes a dangerous precedent, allowing DOT to penalize innocent motorists simply because the resistance level of a breathalyzer machine was not set properly. Thus, I would affirm the trial court.

## I. Trial Court Holding

The trial court sustained the appeal of Flora Sweeney because the trial court accepted her testimony and concluded that "she made the best effort possible at the time to provide the samples but was unable to do so for reasons beyond her control." (Trial court op. at 1.) However, the trial court did not make specific findings of fact to indicate what it meant by "reasons beyond her control." Where a fact finder fails to make its findings of fact explicit in its decision, this court will examine the fact finder's implicit findings to see whether the record contains substantial evidence to support those findings. *See Thomas v. Unemployment Compensation Board of Review*, 104 Pa.Cmwlth. 348, 521 A.2d 999 (1987).

First, in order to sustain Sweeney's appeal on the basis of matters "beyond her control," it was necessary for the trial court to find that an Intoxilyzer 5000 with a resistance setting above three pounds per square inch may prevent a sober and healthy person from providing sufficient breath samples. This implicit finding is supported by the expert testimony of Charles L. Winek.

Winek is a professor of toxicology at Duquesne University and was the chief toxicologist of Allegheny County for thirty-two years. (R.R. at 35a.) He started the breath testing program in Allegheny County in 1966 and, for many years, taught Intoxilyzer 5000 certification courses for police officers. (R.R. at 35a–36a.) Winek testified that: (1) the Intoxilyzer 5000 registers a deficient breath sample when the licensee does not blow with enough pressure to overcome the resistance offered by the feedback mechanism in the instrument's cylinder; (2) the resistance offered by the cylinder can vary; (3) the manufacturer sets the resistance level at six pounds per square inch at the factory; (4) some sober and healthy persons are unable to provide a sufficient breath sample when the Intoxilyzer 5000's resistance is at the factory setting; and, (5) as a result, Allegheny County decided to lower the resistance setting to three pounds per square inch.[2] (R.R. at 36a–

1. *See Todd v. Department of Transportation, Bureau of Driver Licensing*, 555 Pa. 193, 723 A.2d 655 (1999) (stating that a motorist must be allowed a reasonable and sufficient opportunity to complete chemical alcohol testing).

2. The majority characterizes Winek's testimony as conjecture and mere possibilities. (Majority op. at 688–689.) It is true that Winek testified he does not know the setting of the actual machine used to test Sweeney on April 10, 1998. (R.R. at 38a.) However, there is nothing conjectural or merely possible about Winek's explanation of the Intoxilyzer 5000's resistance mechanism, his expert opinion that

38a.) In other words, according to Winek, any setting above three pounds per square inch may prevent a sober and healthy person from providing sufficient breath samples.

Second, in order to sustain Sweeney's appeal based on Winek's testimony regarding the inability of some sober and healthy persons to provide sufficient breath samples, it was necessary for the trial court to find that Sweeney was sober and healthy when she took the breathalyzer test. Sweeney's testimony and the testimony of Officers Matthew Cornwall and Howard McQuillan support this implicit finding.

Officer Cornwall testified as follows. He stopped Sweeney's vehicle on April 10, 1998 because it went through a red light. When he inquired about the odor of alcohol coming from the interior of the vehicle, Sweeney explained that she had just dropped off friends who had been drinking. (R.R. at 10a–12a, 17a.) He then asked Sweeney to step out of the vehicle for field sobriety tests. Sweeney had no trouble exiting the vehicle, had no difficulty standing on her own and had no problem with her speech. (R.R. at 21a–22a.) He asked Sweeney to walk in a straight line on a downhill grade, but Sweeney did not follow his instruction to touch her heels to her toes. He then transported Sweeney to the police station for a breath test. (R.R. at 18a, 20a–21a.) During the test, Sweeney appeared to be sincere in

trying to provide sufficient breath samples and wanted to keep trying when she was unable to do so.[3] (R.R. at 19a.) Officer Howard McQuillan testified that Sweeney did not inform him of any breathing disorder prior to or during the test. (R.R. at 31a.) Sweeney would later testify that she could not understand "why it [the Intoxilyzer 5000] didn't work." (R.R. at 47a.)

It is clear that the trial court accepted Sweeney's explanation that, on April 10, 1998, she had been the designated driver for a group of her friends. It is equally clear that the trial court gave much weight to the fact that Sweeney exhibited no signs of intoxication when she exited her vehicle, when she stood on her own and when she spoke. The trial court gave little weight to the fact that Sweeney did not follow Officer Cornwall's instruction to touch heel to toe while walking the straight line. Finally, the trial court believed that Sweeney had no breathing disorder and considered Sweeney's sincere efforts during the test and her confusion over her inability to provide sufficient breath samples to be indications of her sobriety.

Given the fact that Sweeney was sober and healthy and the fact that some sober and healthy people cannot provide sufficient breath samples when the Intoxilyzer 5000's resistance setting is above three pounds per square inch, it was reasonable for the trial court to conclude that the resistance setting on the Intoxilyzer 5000

the resistance setting affects a person's ability to provide sufficient breath samples or his expert opinion that three pounds per square inch is a proper setting.

**3.** The majority states that, according to the testimony of Officer McQuillan, Sweeney did not blow properly into the machine. (Majority op. at 688.) However, it is clear from the trial court's holding that this testimony was rejected. Indeed, to sustain Sweeney's ap-

peal based on something "beyond her control," the trial court could *not* have accepted Officer McQuillan's testimony and found that Sweeney herself caused the problem by blowing improperly into the machine. I point out that questions of credibility are for the trial court to resolve. *Burke v. Department of Transportation, Bureau of Driver Licensing,* 733 A.2d 13 (Pa.Cmwlth.1999), *appeal granted,* 563 Pa. 692, 760 A.2d 857 (2000).

used here prevented Sweeney from receiving a reasonable and sufficient opportunity to complete chemical testing.[4] *See Todd v. Department of Transportation, Bureau of Driver Licensing*, 555 Pa. 193, 723 A.2d 655 (1999). Because the evidence supports the trial court's decision, that decision should be affirmed.

## II. Implications

The majority resists affirming the trial court in this case because it would "effectively destroy the viability of the Intoxilyzer 5000 as an effective tool in the unending battle against the drunken drivers on our roads." (Majority op. at 689.) I disagree. It is a simple matter for DOT to present evidence in *per se* refusal cases to establish a particular machine's resistance setting.

Moreover, I point out that a licensee once challenged the reliability of the Breathalyzer 1000 machine because radio signals interfered with its operation.[5] *See Baldinger v. Commonwealth*, 116 Pa. Cmwlth. 339, 509 A.2d 912 (1986). As a result, the manufacturer modified the instrument. *Id.* Also, at one time, there were no regulations pertaining to the cali-

bration of breath test equipment. *See Commonwealth v. Williamson*, 356 Pa.Super. 397, 514 A.2d 917 (1986). As a result, regulations were promulgated. *Id.* Thus, here, there will not be disastrous consequences from our affirming the trial court. As in the past, having recognized a potential problem with breath testing technology, the appropriate entities will act to provide a solution.

It is important to note that, currently, there are no regulations governing the resistance level of breath test equipment. Winek has testified that some sober and healthy people cannot provide sufficient breath samples at the factory resistance setting of six pounds per square inch. Assuming that some counties do not alter the factory setting on the Intoxilyzer 5000, DOT may have suspended the operating privileges of many sober and healthy licensees simply because they could not blow enough breath into a machine. Moreover, this situation will continue unless DOT is forced to promulgate regulations establishing a standard for the resistance setting of breath test equipment and requiring periodic checks to verify a machine's resistance level.[6]

4. The majority states that, according to Officer McQuillan, the Intoxilyzer 5000 was operating properly. (Majority op. at 688.) However, Winek testified that Officer McQuillan would have no way of knowing the Intoxilyzer 5000's resistance level because this setting "is done by a technician." (R.R. at 44a.) In sustaining Sweeney's appeal, the trial court obviously accepted Winek's testimony and concluded that Officer McQuillan knew nothing about the Intoxilyzer 5000's resistance setting.

5. Like the Intoxilyzer 5000, the Breathalyzer 1000 was on the National Highway Traffic Safety Administration's list of qualified products. *See Baldinger v. Commonwealth*, 116

Pa.Cmwlth. 339, 509 A.2d 912 (1986); *see also* majority op. at 689.

6. Winek testified that the resistance level of an Intoxilyzer 5000 could be set so high that "nobody could blow hard enough" to provide sufficient breath samples. (R.R. at 44a.) Under the majority's holding, if a technician erroneously sets a machine's resistance level that high, the mistake will not be discovered until a licensee who has failed a breath test for insufficient breath samples pays an expert to examine the device. In the meantime, DOT may legally suspend the operating privileges of licensees who happened to be tested on a machine whose resistance level could preclude a sober and healthy person from providing sufficient breath samples.

For the foregoing reasons, I would affirm the trial court.